IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **FIRST BAPTIST CHURCH OF LILLIAN** )<br>)<br>   Plaintiff, )<br>)<br>vs. )<br>)<br>)<br>**CHURCH MUTUAL INSURANCE COMPANY** )<br>)<br>)<br>   Defendant. ) | **CIVIL ACTION NO. 1:21-00477-KD-MU** |

## Order

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Church Mutual Insurance Company (Doc. 23); the Response by Plaintiff First Baptist Church of Lillian (Doc. 27); and Defendant's Reply (Doc. 31).

## II.   Findings of Fact[1]

Plaintiff First Baptist Church of Lillian ("Lillian") entered into an insurance contract (the "Policy") with Defendant Church Mutual Insurance Company ("Church Mutual") with a policy period from February 1, 2019 – February 1, 2022. The Policy provides insurance coverage for Lillian's church and educational building (the "Sanctuary building") and the family life center (the "Gym building") (together, the "Property"). The Policy does not provide coverage to a new, unfinished metal building. The Policy was in effect at the time Hurricane Sally made land fall on

---

[1] The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

September 15, 2020, in which the Property sustained damage. Lillian's premises is laid out as follows:



Doc. 24 at 7; Doc. 28 at 3.

Prior to Hurricane Sally making landfall, the Property had sustained cracks in the ceiling and leaks in various classrooms, the gym, and in the conference room . (Doc. 23-6 at 11-12; Doc. 23-7 at 4). However, most if not all of the leaks were repaired before Hurricane Sally made landfall. One of Lillian's longtime church members, William Thrift, testified that he did not "recall any" repairs that had not been done "before Hurricane Sally." (Doc. 23-6 at 13; Doc. 28-1 at 7-8). Other church members, Robert Redd and John Edwards, testified that they did not notice any type of water damage to ceilings, leaks, staining, cracks in sheetrock, or condensation in the windows prior to Hurricane Sally. (Doc. 28-2 at 3-4; Doc. 28-3 at 3-4). Last, Pastor Thompson

testified that there were not any necessary repairs that had not been completed prior to Hurricane Sally. (Doc. 28-4 at 4).

The repairs done prior to Hurricane Sally include an insurance claim for storm damage to the roof of the Gym building in 2018 that Lillian filed with Church Mutual. Church Mutual did not provide any coverage for this claim because the roof damage did not exceed Lillian's deductible. Nonetheless, a contractor, Eric Naquin, repaired the gym roof to prevent further water intrusion into the Gym building.

Following Hurricane Sally, Lillian filed a claim with Church Mutual on or about September 28, 2020. On September 29, 2020, Church Mutual hired an adjusting firm, Engle Martin & Associates ("EM&A") to inspect the Property. (Doc. 23-2 at 4). At the inspection on October 7, 2020, EM&A observed damage to the Property and determined an engineer would need to come examine the cause and extent of the damage that was attributable to Hurricane Sally. (Doc. 23-2 at 4).

On October 20, 2020, engineer Kurt Mulder ("Mulder") of Engineering Design & Testing Corp., an expert for Church Mutual, inspected the Property. Mulder concluded that the damage to the Sanctuary building, where water was intruding from the steeple, was not caused by Hurricane Sally but had instead been occurring for an extended period of time because of an improper configuration of flashing and cracked caulk. (Doc. 23-5 at 15). Mulder also concluded that small spots of water intrusion within the Sanctuary building were caused by "exposed fasteners, protruding fasteners, and the unsealed shingle corners, and not Hurricane Sally." (Doc. 23-5 at 17). Further, Mulder determined that water intrusion that led to "bowed portions of the roof decking" on the Sanctuary building roof surfaces was caused by "protruding fasteners…and was not the result of Hurricane Sally." (Doc. 23-5 at 17).

At the Gym building, Mulder observed interior water damage and concluded that the condition of the roof "indicated that prior attempts at repair of water intrusion had occurred at [certain] locations, and that the water intrusion had been occurring at these locations prior to [Hurricane Sally]." (Doc. 23-5 at 18). Mulder determined that missing fasteners, protruding fasteners, and overdriven fasteners with broken gaskets contributed to the water intrusion at these locations. Mulder also concluded the "raised-rib, metal panel roofing at [the gym building] was not damaged as the result of wind uplift." (Doc. 23-5 at 20). Last, Mulder's report found that the "multiple locations of water intrusion at [the gym building] were the result of construction defects and wear and tear, and not [Hurricane Sally]." (Doc. 23-5 at 19).

In summary, Mulder's report concluded the following for the Sanctuary building (Building A):

> The water intrusion in Building A, below the steeple was the result of an improper configuration of flashing, which is a construction defect, and cracked caulk, which is a maintenance issue.
>
> The shingle roofing at Building A was not damaged as the result of a hailstorm.
>
> The blisters at Building A were either caused by overheating of the roof system or manufacturing defects, neither of which are a result of Hurricane Sally.
>
> The unsealed shingle corners at Building A were the result of wear and tear, indicating that the shingle roofing at Building A was not damaged as the result of Hurricane Sally.
>
> The upward bowed portions of the roof decking at Building A were the result of water intrusion at protruding fasteners which caused the warping of the decking and was not the result of Hurricane Sally.
>
> The small spots of water intrusion observed at the interior of Building A were the result of exposed fasteners, protruding fasteners, and the unsealed shingle corners, and not Hurricane Sally.

Doc. 23-5 at 20.[2]

> In summary, Mulder's report concluded the following for the Gym building (Building C):
>
> The multiple locations of water intrusion at Building C were the result of construction defects and wear and tear, and not the storm.
>
> The raised-rib, metal panel roofing at Building C was not damaged as the result of wind uplift.

Doc. 23-5 at 20.

Church Mutual notified Lillian of its findings and decision on the claim by letter dated December 17, 2020. (Doc. 23-2 at 5). On December 18, 2020, Church Mutual provided Lillian with a $12,371.33 check for damage sustained to the Property by Hurricane Sally and notified Lillian that "any differences must be approved prior to the start of repairs to be considered for reimbursement." (Doc. 23-2 at 14). On or about February 24, 2021, Pastor Thompson of Lillian spoke with Church Mutual and notified them that its engineer was reviewing the claim. On April 14, 2021, attorney Smith Prestwood ("Prestwood") notified Church Mutual by email that he was retained by Lillian as counsel to assist with handling the claim. (Doc. 23-2 at 38).

On May 17, 2021, Prestwood notified Church Mutual that Michael Biller ("Biller") of Biller Reinhart Engineering Group, Inc., prepared a Report of Site Investigation ("Biller Report") pertaining to damage the Property sustained from Hurricane Sally. (Doc. 23-2 at 28). The Biller Report concluded the following:

> The Sanctuary building:

---

[2] Mulder's report also concluded that a steeple "broke and fell as the result of the storm" and damaged the roof of the new metal building. (Doc. 23-5 at 18).

1. Moisture intrusion related damage observed on the structure's interior finishes and moisture staining on roof decking and framing are due to damaged and breached roof underlayment. The breached roof underlayment is most likely due to tensile and compressive stresses in the roof underlayment resulting from the wind induced cyclical deflection of the roof structure during Hurricane Sally. These stresses are relatively concentrated at roof system fastener locations, changes in roof geometry (i.e. valley, ridge, etc.), and roof penetration (i.e. vent, etc.) locations.

2. Isolated portions of the roof decking and framing exhibiting decay are consistent with longer term moisture intrusion originating prior to Hurricane Sally.

3. Upward roof deck displacement is due to wind uplift forces applied to the roof surface during Hurricane Sally.

4. Separations and cracking at ceiling finishes, wall finishes, wall/ceiling interfaces, wall/wall interfaces, and window/wall interfaces are the result of wind pressure/suction forces applied to the roof and exterior wall surfaces during the storm event. The applied wind loading results in cyclical deflection of the structure and attached finishes.

5. Fogging/condensation between glass windowpanes are the result of breached window seals, due to cyclical wind pressure and suction forces applied to the window surfaces during Hurricane Sally.

6. Observed ceiling repairs within the interior of the structure were performed due to damages sustained during Hurricane Sally, as reported by the owner representative.

7. Minor warping at the wood floor finish within the sanctuary is likely not storm related; however, BillerReinhart cannot rule out moisture intrusion during the storm event as a cause or contributing factor of the observed damage.

8. The following exterior conditions are consistent with damage due to wind forces applied or debris impact during Hurricane Sally:
    a. Displaced and/or deformed metal fascia, soffits, and soffit trim.
    b. Fractured exterior light fixture.
    c. Rotation of the wood fencing located along the east and west elevations.
    d. Displaced walkway rail pickets along the walkway between Buildings A and B.

9. Torn roof shingle is due to wind forces applied to the roof surface during Hurricane Sally.
10. BillerReinhart cannot rule out debris impact during Hurricane Sally as the cause or contributing cause of markings on exterior air conditioning equipment.
11. Stair-step cracking in the brick veneer is likely related to building settlement.
12. Exposed and raised roof fasteners were not the result of the storm event.
13. Blistering on roof shingle surfaces is not related to the storm event.

Doc. 23-8 at 49-50.

The Gym building:

1. Moisture intrusion related damage observed on the structure's interior finishes, moisture staining on roof framing members and roof insulation surfaces, and blistering of roof insulation surfaces are due to a damaged and breached roof system. The breached roof system is due to tensile and compressive stresses resulting from the wind induced cyclical deflection of the roof structure during Hurricane Sally. These stresses are relatively concentrated at roof system fastener locations, changes in roof geometry (i.e. valley, ridge, etc.), and roof penetration (i.e. vent, etc.) locations.

2. Fogging/condensation between glass windowpanes are the result of breached window seals, due to cyclical wind pressure and suction forces applied to the window surfaces during Hurricane Sally.

3. Separation and cracking at the wall and window/wall interfaces are the result of wind pressure/suction forces applied to the exterior surfaces during the storm event. The applied wind loading results in cyclical deflection of the structure and attached finishes.

4. The following exterior conditions are consistent with damage due to wind forces applied or debris impact during Hurricane Sally:
    a. Displaced/missing panel closures at the undersides of the soffit along the perimeter of the structure.
    b. Displaced gutter downspout.
    c. Withdrawn fasteners along the metal fascia and gutter joints.

5. BillerReinhart cannot rule out debris impact during Hurricane Sally as the cause or contributing cause of markings on exterior air conditioning equipment.

> 6. Damaged gutter bracing was not the result of wind forces experienced during the storm event.
> 7. Isolated withdrawn roof panel fastener was not the result of wind forces experienced during the storm event.

Doc. 23-8 at 50-51.

On May 21, 2021, Prestwood forwarded an estimate prepared by Resolved Group ("Resolved Group Estimate") for the cost of repairs to Church Mutual. The initial Resolved Group Estimate totaled $856,877.79, which wrongfully included $311,325.93 in damage to the new, unfinished metal building that was not covered under the Policy.

Consequently, Church Mutual performed a reinspection of the Property on August 21, 2021. Jeremy Elliot of Church Mutual, Mulder, and Michael Odell of BluSky Contractors ("BluSky") were present on behalf of Church Mutual. (Doc. 23-2 at 44). Prestwood and Andy Boutwell of Resolved Group were present on behalf of Lillian.[3] Most notably, at the reinspection, Mulder determined that the roof on the Sanctuary building was damaged by Hurricane Sally and necessitated a replacement. (Doc. 28-11 at 2). Despite this, the roof of the Gym building "was not inspected/addressed during the reinspection." (Doc. 23-2 at 86).

On September 23, 2021, BluSky prepared an estimate that totaled $124,615.53. (Doc. 23-2 at 73). Shortly thereafter, Church Mutual provided $40,288.96 in payment to Lillian.

The payment reflects the following:

| | |
|---|---|
| The Replacement Cost Value | $124,615.53 |
| Less Recoverable Depreciation/Withholding | $20,574.36 |
| Less Nonrecoverable Depreciation | $ |
| Actual Cash Value | $54,713.93 |
| Minus Prior Payments | $14,424.97 |
| Minus Deductible | $92,450.00 |
| Payment Amount | $40,288.96 |

---

[3] Biller was not present at the reinspection.

Doc. 23-2 at 79.

Following the reinspection and additional payment, Prestwood notified Church Mutual on October 1, 2021, that there were still items in dispute, with the "largest item of dispute" being "the roof on the gym building." (Doc. 23-2 at 86). Four days later, on October 5, 2021, Prestwood notified Church Mutual that he filed the present action on behalf of Lillian.[4]

### III. Standard of Review on Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c) provides as follows:

> *(c) Procedures*
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

---

[4] After this action was filed, Jason Nezat, a cost and replacement value expert for Lillian, of Resolved Group went to reinspect the property in March 2022. Nezat did not inspect the Gym building roof but instead relied on Biller's report concluding that the Gym building roof was damaged by Hurricane Sally. (Doc. 23-10 at 8). Nezat's most recent estimate (to the Court's knowledge) is $295,563.02 for the Sanctuary building and $325,000.74 for the Gym building. (Doc. 23-10 159-160). This estimate does not include repairs to cracks in the ceiling of the Sanctuary building because they predated Hurricane Sally. (Doc. 23-10 at 10).

> ***(4) Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. Rule 56(c).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

**IV.     Applicable Law**

The parties did not cite to a choice of law provision in the Policy. However, the Policy appears to have been issued and delivered to Lillian in Alabama. The incident giving rise to the insurance claim occurred in Alabama. Accordingly, Alabama law applies to the interpretation of the policy. See Stovall v. Universal Construction Co., 893 So.2d 1090 (Ala. 2004) ("In a contractual dispute, Alabama law would have us first look to the contract to determine whether the parties have specified a particular sovereign's law to govern. Cherry, Bekaert & Holland v. Brown, 582 So.2d 502, 506 (Ala. 1991). Lacking such a contractual specification, we follow the

principle of *lex loci contractus,* applying the law of the state where the contract was formed. Brown, 582 So.2d at 506. That state's law then governs unless it is contrary to the forum state's fundamental public policy. Id. at 506–07.").

Since "general rules of contract law and interpretation govern the interpretation of an insurance policy, Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So.2d 687, 691 (Ala. 2001), the [C]ourt must assign the insurance policy its clear and plain meaning and interpret it to give effect to all terms and provisions. See Brewbaker Motors, Inc. v. Belser, 776 So.2d 110, 112 (Ala. 2000); Bd. of Water & Sewer Comm'rs of Mobile v. Bill Harbert Constr. Co., 870 So.2d 699, 710 (Ala. 2003). If an insurance policy is ambiguous, or its meaning is in doubt or uncertain, it is construed against the insurer. Scottsdale Ins. Co. v. National Security Fire and Casualty Ins. Co., 741 So.2d 424, 426, 427 (Ala. Civ. App. 1999)." Cont'l Cas. Co. v. Alabama Emergency Room Admin. Servs., P.C., 623 F. Supp. 2d 1290, 1294 (M.D. Ala.), aff'd, 355 F. App'x 332 (11th Cir. 2009).

V.   **Analyses**

   A.  **Breach of Contract**

Lillian asserts a breach of contract claim in Count 1 of the Complaint. Church Mutual argues this claim is due to be dismissed because they did not breach the insurance contract and instead handled the underlying claim pursuant to their contractual obligations.

Under Alabama Law, a plaintiff must prove four elements to recover on a breach of contract claim: "'(1) the existence of a valid contract binding the parties in the action, (2) [their] own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 975 (Ala. 1998) (quoting Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala. 1995))." Cong. Life Ins. Co. v. Barstow, 799

So. 2d 931, 937 (Ala. 2001); see also Arrington v. Wells Fargo, 842 F. App'x 307, 312 (11th Cir. 2020).

Church Mutual argues that Lillian's breach of contract claim is due to be dismissed because Lillian has allegedly "failed to meet its burden of showing that certain damages are the result of a covered loss as opposed to pre-existing damage." (Doc. 24 at 26). Yet, as Lillian points out in response, its expert, Biller, attributes the claimed damage to Hurricane Sally. (Doc. 28 at 22). In reply, Church Mutual argues that Biller improperly reached his conclusions.[5] (Doc. 31 at 9).

Clearly, as Church Mutual and Lillian both point out in their briefs, material issues of fact are in dispute. (Doc. 24 at 20-21; Doc 28 at 20-21). Most notably, Church Mutual's expert, Mulder, and Lillian's expert, Biller, have a difference in opinion as to whether the damage to the Gym roof was caused by Hurricane Sally or improper repair work / maintenance.

Accordingly, there are issues of material fact that remain which must be resolved by a fact finder.[6] Therefore, Church Mutual's motion for summary judgment on the breach of contract claim fails as a matter of law.

---

[5] Though Church Mutual takes issue with Biller's testimony and report, it did not move to exclude Biller as an expert. And the alleged flaws in Biller's report go to the weight the jury decides to give to his opinion, not to admissibility.

[6] Church Mutual asserts fact and cites to dozens of pages to support a single contention on multiple occasions. See, *e.g.*, Doc. 24 at 28 (Church Mutual cites to 223 pages when arguing that a policy exclusion applies). Moreover, Church Mutual indirectly claims to have paid for many of the repairs Lillian contends are necessary and due to Hurricane Sally without providing succinct breakdowns of their payments – their support is merely generalizations. This made it difficult to determine for what Church Mutual actually compensated Lillian.

Civil Local Rule 56(a) and (b) requires the parties to provide "a specific, pinpoint citation" to the facts relied upon in their summary judgment briefs. It is not the task of this Court to scour the record to find evidence in support of the parties positions. As noted in July v. Board of Water and Sewer Commr. of City of Mobile, 2012 WL 5966637 at note 10 (S.D. Ala. Nov. 29, 2012): "[t]he Court cannot and will not make a party's summary judgment argument for

### B. Bad Faith

Lillian argues that Church Mutual acted in bad faith in how the claim was handled. Church Mutual argues that it had a legitimate reason to dispute coverage, which prevents Lillian from recovering on a bad faith claim. Under Alabama law, a plaintiff must prove the following in a bad faith denial of coverage claim:

> "(a) an insurance contract between the parties and a breach thereof by the defendant;
> (b) an intentional refusal to pay the insured's claim;
> (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
> (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
> (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
> Requirements (a) through (d) represent the "normal" case. Requirement (e) represents the "abnormal" case."

Employees' Benefit Ass'n v. Grissett, 732 So. 2d 968, 976 (Ala. 1998) (internal cites and quotations omitted).

"Alabama courts have made clear that, '[w]hen a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.' Nat'l Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982). Thus, a plaintiff seeking to prove a bad-faith claim has a heavy burden. Shelter Mut. Ins. Co. v. Barton, 822 So.2d 1149, 1154 (Ala. 2001). To establish a *prima facie* case, the plaintiff 'must show that the insurer's decision not to pay was without any ground for dispute.' Id. (quotation omitted). In so doing, the plaintiff 'must eliminate any arguable reason propounded by the insurer for refusing to pay the claim.' Id. (quotations

---

it.... See Rule 56(c), Fed.R.Civ.P. (clarifying that parties must support their factual positions on summary judgment by 'citing to particular parts of materials in the record' …). In sum, a party may not, by dumping evidentiary material into the record, unilaterally shift to the Court its burden of identifying evidence supporting its position.

omitted). In assessing whether the insurer had an arguable reason for denying the claim, the court must look to the information before the insurer at the time it denied the claim. See Bowen, 417 So.2d at 183." Atl. Specialty Ins. Co. v. Mr. Charlie Adventures, LLC, 644 F. App'x 922, 926 (11th Cir. 2016).

Here, Church Mutual hired Kurt Mulder of Engineering Design & Testing Corp., and Michael Odell of BluSky Contractors to conduct an in depth inspection of the Property to determine which damages were attributable to Hurricane Sally. Church Mutual relied on the report provided by Mulder and Odell in deciding which damages to provide compensation for and which damages to dispute. Thus, Church Mutual's position was, at a minimum, fairly debatable and Lillian has not presented evidence sufficient to overcome the stringent burden a plaintiff is subject to in a bad faith failure to pay claim. Accordingly, Lillian's bad faith claim fails as a matter of law.

**VI.   Conclusion**

Accordingly, for the reasons set forth herein, Defendant Church Mutual Insurance Company's Motion for Summary Judgment is **DENIED** as to Count One (Count I) and **GRANTED** as to Count Two (Count II).

**DONE** and **ORDERED** this the 9th day of **December 2022.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**